**UNITED STATES of America, Plaintiff-Appellee,**

v.

**George E. GLASS, Defendant-Appellant.**

No. 83-4774.

United States Court of Appeals, Fifth Circuit.

Aug. 28, 1984.

Peatross, Greer & Hayter, L. Edwin Greer, Shreveport, La., for defendant-appellant.

Joseph S. Cage, Jr., U.S. Atty., D.H. Perkins, Jr., Asst. U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before CLARK, Chief Judge, JOLLY, and DAVIS, Circuit Judges.

CLARK, Chief Judge:

George E. Glass appeals his conviction for conspiracy to possess cocaine with intent to distribute. He argues that district court erred by denying his motion to suppress evidence discovered as the result of a search of his person following an investigatory stop by law enforcement officers. We reverse because the record made on the motion to suppress fails to demonstrate that the officers possessed the requisite reasonable suspicion necessary to perform an investigatory stop.

I

On April 18, 1983, DEA Agent James Hawkins, who was stationed in Shreveport, Louisiana, received a telephone call from an El Paso, Texas, DEA agent, who had received an anonymous tip from an unidentified person in Florida. Hawkins was told that two individuals identified as Flores and Glass would arrive in Shreveport on an evening flight from Ft. Lauderdale, Florida, via Atlanta, Georgia. He was also given a physical description of the two men.[1]

---

1. The only description of the "tip" in the record is contained in the following extracts from Agent Hawkins's testimony:

In the late afternoon of April 18, I received information from another DEA agent and based on that information I proceeded to the Shreveport Regional Airport .... The information given to me indicated that two sub-

jects were to arrive in Shreveport, Louisiana, on a flight later that evening from the Fort Lauderdale, Florida, area. They would be travelling under the names of Flores and Glass. I checked with the airlines and they had no subjects booked under those names before [it] left.

Later that evening, Hawkins, accompanied by four Louisiana state troopers and a Caddo Parish deputy sheriff, arrived at the Shreveport airport to begin surveillance of the Ft. Lauderdale flight and to monitor the activities of Flores and Glass.

As Hawkins was observing the deplaning passengers, he saw an individual subsequently identified as Paul Flores exit the airplane and remain in the airport concourse. A few seconds later, he observed an individual subsequently identified as Glass exit the airplane and approach Flores, who was standing against a wall and looking up and down the concourse. Glass approached Flores and said, "There he is." After this brief encounter Glass turned away from Flores and began to walk down the concourse. Following thirty to forty feet behind Glass, Flores also proceeded down the concourse. Hawkins walked about the same distance behind Flores.

As Glass approached the escalator leading to the baggage claim area, Hawkins signaled Deputy Sheriff Billy Golden of the Caddo Parish Sheriff's Department and State Trooper Randall Pepper to stop Glass. At the same time, Hawkins, assisted by State Trooper William Valentine, stopped Flores.

Pepper approached Glass, identified himself as a police narcotics officer, showed Glass his badge, told him that he and Golden wanted to talk to him, and asked him to step to the side of the escalator. When Pepper requested identification, Glass produced a Louisiana driver's license bearing his name and an airplane ticket, which also had been issued in his name. Glass was then asked to walk a distance of ten to fifteen feet to where Hawkins and Valentine were talking with Flores.

Hawkins, assisted by Valentine, had approached Flores, identified himself as a federal narcotics agent and Valentine as a police officer, told Flores that he would like to talk with him in private, and asked him to step out of the line of passenger traffic approaching the escalator. After Flores complied, Hawkins informed him that he was conducting an investigation and asked for his identification and plane ticket. Flores produced a New Mexico driver's license in his name and a travel agency packet containing two airline tickets. One ticket was in the name of Tom Thompson for travel from Roswell, New Mexico, to Ft. Lauderdale. The second ticket was in the name of Childs for travel from Ft. Lauderdale to Shreveport. When asked why he was traveling under assumed names, Flores became nervous and began to stutter. He then told Hawkins that he always traveled under an assumed name.

After Hawkins, Valentine, and Flores were joined by Glass and the other two police officers, Hawkins told Flores and Glass that he had reason to believe they were carrying illegal contraband and asked them for permission to search their persons and luggage. After Flores said a search would be "no problem," Glass nodded assent and said, "Okay." Hawkins then

---

I was given a complete physical description of the two subjects, Flores and Glass.
. . . .
Mr. Hawkins, you indicated that you received information in the late afternoon of April 18 from a DEA agent.
Yes, sir.
Where is that agent located?
In El Paso, Texas.
Did that agent have personal knowledge of the facts that he related to you?
No, only as related to him.
What was the source of that knowledge?
I do not know. It was an individual but I do not know the individual.
In fact, it was an anonymous telephone call; was it not?

That was what I understood it to be, yes, sir.
Where did the call go to?
The agent in El Paso received a call from Florida—someone in either Miami or Fort Lauderdale, Florida, area and then relayed it to me.
So you have no way of knowing who made that telephone call?
No, sir.
But that is the basis of your going to the airport at Shreveport?
Yes, sir.
The district court construed the anonymous tip as indicating that a "drug transaction" would take place at the Shreveport airport. The record does not support such a construction of the tip.

asked the two men to accompany him to the men's restroom. After reaching the restroom, Hawkins asked Flores to remove his clothing. Following a search of Flores's clothing, Pepper asked Glass to remove his clothing. Glass complied, and as he undressed, five tightly wrapped, brown paper bags containing a total weight of 540 grams of cocaine were found in his socks. Glass and Flores were arrested. A later search of Glass's luggage produced a legal pad, which contained numerous notations of ounces, pounds, amounts of money, and references to profits and expenses.

Glass filed a motion to suppress the cocaine and the legal pad. After holding a hearing, a United States magistrate recommended that the motion be denied. Following the filing of objections to the magistrate's report, the district court reviewed a transcript of the hearing and issued a memorandum ruling denying the motion to suppress. Upon denial of the motion, Glass pled guilty pursuant to Fed.R.Crim.P. 11(a)(2).[2] He was sentenced to three years imprisonment.

## II

Glass argues that the search of his person and luggage violated the Fourth Amendment. He contends he was too intoxicated to give a knowing and voluntary consent and that, if his consent was voluntary, it was the product of an illegal seizure. We do not reach the voluntariness issue because we hold that the investigatory stop, which preceded the request for consent, was invalid and that the consent was the result of the illegal stop.

Supreme Court holdings sculpt out, at least theoretically, three tiers of police-citizen encounters: communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief "seizures" that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause.

*United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982) (en banc). We deal here with the second type of encounter—a brief "seizure," or investigatory stop, the basis of which is that police have reasonable suspicion to believe a crime is being or is about to be committed. *See Brown v. Texas,* 443 U.S. 47, 51, 99 S.Ct. 2637, 2641, 61 L.Ed.2d 357 (1979). The Supreme Court has defined reasonable suspicion as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *see United States v. Scott,* 678 F.2d 32, 35 (5th Cir.1982). In essence, the question here is whether, based upon the totality of circumstances, the officers who stopped Glass had a "particularized and objective basis" for suspecting that he was committing a crime. *See United States v. Cortez,* 449 U.S. 411, 417–18, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981).

When the officers informed Glass and Flores that they were suspected of illegal activity, they were seized for purposes of the Fourth Amendment. *See Florida v. Royer,* 460 U.S. 491, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983). The "specific and articulable facts" that the officers had when they seized Glass were that (1) an El Paso DEA agent told agent Hawkins that two individuals of certain physical descriptions would be traveling to Shreveport, (2) Glass arrived on a flight from Ft. Lauderdale, a source city, (3) Glass and Flores recognized each other after deplaning, (4) Flores was travelling under an assumed name and appeared nervous when questioned.

Neither singly nor together, did these facts afford the officers a particularized and objective basis for reasonable suspicion

---

**2.** Rule 11(a)(2) provides:

With the approval of the court and the consent of the government, a defendant may enter a conditional plea of guilty or nolo contendere, reserving in writing the right, on appeal from the judgment, to review of the adverse determination of any specified pretrial motion. If the defendant prevails on appeal, he shall be allowed to withdraw his plea.

to believe Glass was committing a crime. Glass produced a valid driver's license and a legitimate airline ticket. When asked if Glass did anything "unusual" while walking down the concourse, Agents Hawkins and Pepper unequivocally answered no. Hawkins ·elaborated on his answer by saying that Glass "proceeded in a direct manner" and "occasionally" looked back in Flores's direction. This elaboration in no way contradicted his previous direct answer.[3] The phone call from the El Paso DEA agent did not indicate that Glass was suspected of criminal activity. For all the record tells us the anonymous tipster may have told the El ·Paso agent that the two parties he described were wholly innocent travelers from Ft. Lauderdale to Shreveport. Certainly it did not expressly convey information of an incriminating nature.

In other cases in which reasonable suspicion has been found to exist, courts have considered the kind of facts present in today's case, that is, that Flores was flying under an assumed name, that he was nervous when this behavior came to light, and that the point of origin of their flight was Ft. Lauderdale. But aside from these facts, the "other circumstances describe a very large category of presumably innocent travelers, who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Reid v. Georgia*, 448 U.S. 438, 440, 441, 100 S.Ct. 2752, 2753, 2754, 65 L.Ed.2d 890 (1980) (per curiam). We recognize the Supreme Court has pointed out that entirely innocent behavior may on occasion justify the suspicion that criminal activity is afoot. *See id.* But such an occasion is not presented by this case. That a fellow passenger, even one who was an acquaintance, was traveling under assumed names and acted nervous when this was revealed cannot be the catalyst that converts Glass's otherwise wholly innocent activity into reasonable suspicion. A corroborated tip indicating illicit activity might have created a different result, but that is not this case. Here, the officers' perceptions about Glass's activity amounted to no more than an "inchoate and unparticularized suspicion or 'hunch,'" *Terry v. Ohio*, 392 U.S. at 27, 88 S.Ct. at 1883. The record facts make "too slender a reed" on which to support his seizure. *See Reid v. Georgia*, 448 U.S. at 441, 100 S.Ct. at 2754.

The order denying the motion to suppress is reversed. The judgment of conviction is vacated and the cause is remanded for further proceedings consistent with this opinion if the United States chooses to reprosecute. Should such reprosecution occur and should defendant renew his motion to suppress, we leave to the district court's discretion whether the United States should be limited by the proof adduced on the original motion. Such discretion should be exercised on the same basis as the court would have applied to a motion to reopen the proof had the district court sustained the motion to suppress on the grounds set out above.

VACATED AND REMANDED.

---

**3.** The government attorney questioned Hawkins:

> Did you observe [Glass's] actions down the concourse?
> Yes, sir.
> All right. Was there anything unusual about his actions or anything that sticks out in your mind as to how he walked or what he did or that type of thing?
> No, sir. He proceeded in a direct manner down the concourse. Occasionally he would turn around and look back in our direction.

> I was following Mr. Flores approximately thirty to forty feet behind him and occasionally Mr. Glass would turn around and look in our direction.

The government attorney asked Pepper:

> So you were observing [Glass] as he came down the concourse; is that correct?
> Yes, sir.
> Okay. Did you notice anything about the way he walked? Was there anything unusual that stuck in your mind?
> No, sir.