**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Robert Michael HANSON and Carlos Jamie Garza, Defendants-Appellants.**

**No. 86–1065.**

United States Court of Appeals, Fifth Circuit.

Oct. 7, 1986.

---

Jerry R. Hoodenpyle, Thomas E. Myers, Arlington, Tex., (Court-appointed), for Hanson.

Jack W. Beech, Fort Worth, Tex., (Court-appointed), for Garza.

Terrence J. Hart, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, JOHNSON, and WILLIAMS, Circuit Judges.

THORNBERRY, Circuit Judge:

Defendant-appellants Robert Michael Hanson and Carlos Jamie Garza appeal the district court's denial of their motion to suppress evidence obtained from them as a result of a warrantless search at Dallas Fort-Worth International Airport ("DFW"). In addition, Hanson contends that the evidence presented to the district court is insufficient to support his conviction for conspiring to possess cocaine with intent to distribute it in violation of 21 U.S.C. § 846. Because we believe that the district court correctly denied defendants' motion to suppress and received evidence sufficient to support Hanson's conviction, we affirm the decision of the district court.

The crucial events in this case took place during an "airport stop" of defendants Hanson and Garza at DFW airport by law enforcement officials on April 11, 1985. A full chronology of the relevant events, however, must begin on April 10 in San Diego.

On April 10, law enforcement officials at the San Diego International Airport observed two men purchasing one-way tickets to Miami. The individuals paid for their tickets in cash. They appeared nervous. A Drug Enforcement Agency ("DEA") official named Cooper attempted to question the two individuals, but they refused to respond to his inquiry.[1] A check of the flight manifest revealed that the two men had purchased tickets under the names of Rick and Bill Free. The individuals' behavior aroused the suspicions of the narcotics officers, who relayed those suspicions to officials in Houston, a connecting stopover for the Miami flight.

Sgt. Foehner of the Houston airport narcotics detail observed the men in Houston.

Again, they appeared nervous. A check of the flight manifest revealed no passengers named Rick or Bill Free. The two individuals boarded the Miami flight without incident.

The following day, April 11, Sgt. Foehner again observed the two individuals returning from Miami.[2] He believed they were wearing the same clothes as they had worn the previous day. One of the individuals, later identified as Hanson, wore a distinctive wide-brim "Indiana Jones" type hat. Both men carried briefcases. Sgt. Foehner observed the two men board the flight to Dallas.

Sgt. Foehner relayed this information and his suspicions that the two men might be transporting narcotics to Sgt. Pinkston of the Department of Public Safety at DFW. Upon receiving this information, Pinkston called DEA agent Van Patten.

Van Patten and Pinkston identified the two men coming off the Houston flight on the basis of the description Pinkston had received from Sgt. Foehner. Pinkston and Van Patten followed the men to the baggage claim area. The individuals appeared nervous and watchful. One of the men, later identified as Garza, went to a public phone several times, apparently without making a call. Garza chain-smoked and paced about the baggage claim area while Hanson waited outside. When the bags arrived at the carrousel, Garza first claimed a green garment bag and set it beside the carrousel. He claimed a brown sports bag and brought it outside to the area where Hanson was standing. Then he went back to the baggage area to retrieve the garment bag.

Pinkston and Van Patten observed Hanson and Garza waiting outside the terminal. An airport shuttle bus pulled up in front of the defendants. Believing that they intended to board the bus, Pinkston and Van Patten (now joined by two other officers)

---

1. At the suppression hearing, Hanson testified that he did not stop when the officer confronted him in San Diego because he believed the man to be a Hare Krishna solicitor.

2. Sgt. Foehner's second observation of the two men was something of a coincidence. The two men attracted his attention and he recognized them from the previous day.

ran outside the terminal and approached Hanson and Garza. All the officers wore plain clothes. Two of the officers stood behind the defendants while Pinkston and Van Patten stood either in front of them or slightly to one side.

Pinkston identified himself to Hanson as a police officer and asked if he could speak with him. Hanson agreed. Pinkston asked to see Hanson's airline tickets and Hanson produced both his own ticket and Garza's. The tickets bore the names of Bob and Charles Jenkins. Pinkston asked for further identification and Hanson produced his driver's license. Van Patten made the same request of Garza. Hanson produced a Texas driver's license under the name of Robert Hanson. Garza produced a license under the name of Carlos Garza. Van Patten returned Garza's license to him but Pinkston apparently did not return Hanson's.

Pinkston asked Hanson if he could speak with him apart from the others. Hanson complied, stepping several feet away from the group. Pinkston informed Hanson that, based on information he had received, he suspected Hanson and Garza of carrying narcotics. Hanson offered to let Pinkston search his briefcase. This initial search revealed nothing. Pinkston then asked for permission to search the other bags. Hanson agreed and informed Garza that he had done so. Garza either indicated approval or merely acquiesced.

At this point, one of the officers noticed what appeared to be a shotgun barrel protruding from the garment bag. A search of the bag revealed a shotgun, an automatic handgun, a boot knife, a bullet-proof vest and a device identified by Pinkston as a cocaine sifter.

The officers next directed their attention to the brown sports bag. The bag was locked. Van Patten inquired as to the existence of a key. Hanson produced one and either Hanson or Van Patten unzipped the bag and searched its contents. He discovered a white powdery substance, later identified as cocaine, in the false bottom of an aerosol spray can. Both men were immediately arrested and advised of their *Miranda* rights. Both men were searched incident to this arrest. The search revealed additional quantities of cocaine concealed on their persons.

Both men were indicted on charges of conspiracy to possess cocaine with intent to distribute (21 U.S.C. § 846) and of possession of cocaine with intent to distribute (21 U.S.C. § 841(a)(1)). Both defendants filed motions to suppress the evidence seized at DFW airport, arguing that the officers obtained the evidence in violation of the fourth amendment. The district court denied the motion. The government proceeded to trial on the conspiracy count only. After a joint trial to the bench on stipulated facts, defendants were convicted and sentenced to six years in prison.

On appeal, Hanson and Garza muster two primary arguments. First, they argue that the initial contact between themselves and the officers amounted to an arrest requiring probable cause but that probable cause was not established until after the officers had discovered the cocaine, a discovery tainted by the illegal arrest. In the alternative, they argue that, even if the contact did not amount to a full scale arrest, it was at least an investigatory stop requiring reasonable suspicions on the part of the detaining officers that defendants were engaged in criminal activity. Defendants contend that reasonable suspicion is not presented on these facts.[3] A proper resolution of these contentions requires a brief overview of conventional fourth amendment analysis.

▮ The leading case in this circuit on the interplay of airport drug investigations and the fourth amendment is *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (Unit B) (en banc). In *Berry*, this court noted that the Supreme Court has recog-

---

**3.** In reviewing a trial court's decision on a suppression motion, we accept the court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the party prevailing on the motion. *United States v. Maldonado*, 735 F.2d 809, 814 (5th Cir.1984).

nized three distinct levels or tiers of police-citizen contact within the context of the fourth amendment. On the first level is mere communication between a citizen and an officer, involving no element of detention or coercion. Such contact does not implicate the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 1879, n. 16, 20 L.Ed.2d 889 (1968). On the second level are brief detentions or investigatory stops which must be supported by "reasonable suspicion" on the part of the detaining officer based on "specific and articulable facts which, taken together with rational inferences from these facts, reasonably warrant an intrusion." *Id.* at 21, 88 S.Ct. at 1879. Full scale arrests occupy the third tier, involving the types of restrictions on liberty imposed by formal custody. *Florida v. Royer*, 460 U.S. 491, 498–501, 103 S.Ct. 1319, 1324–26, 75 L.Ed.2d 229 (1983). Under the fourth amendment, an arrest cannot be conducted in the absence of probable cause.

This three-tiered approach presents this court with two questions: when were the defendants "seized" within the meaning of the fourth amendment and which tier does that seizure occupy?

■ In *Berry*, this circuit adopted a test formulated by Justice Stewart in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980): a seizure has occurred if "in view of all the circumstances surrounding the incident, a reasonable person would have believed he was not free to leave." 446 U.S. at 554, 100 S.Ct. at 1877. The district court apparently held the view that no seizure ever occurred (prior to the arrest) in the contact between defendants and the officers at DFW, although the court's brief order is unclear on this point. In any event, we find that, for fourth amendment purposes, a seizure occurred at the point Pinkston took Hanson aside and informed him that he was suspected of carrying narcotics. *United States v. Glass*, 741 F.2d 83 (5th Cir.1984). As this Court noted in *Berry*, "statements

which intimate that an investigation has focused on a specific individual easily could induce a reasonable person to believe that failure to cooperate would only lead to formal detention." *Berry*, 670 F.2d at 597. Before Pinkston asked Hanson to step aside, the officers' conduct did not implicate the fourth amendment. They merely approached the defendants, displayed their badges, and asked questions. *United States v. Berd*, 634 F.2d 979, 984–85 (5th Cir.1981). But, when Pinkston asked Hanson to step aside, apparently retained his driver's license [4] and informed Hanson that he and Garza were suspected of carrying drugs, a reasonable person would not have believed that he was free to go.

The Supreme Court and this circuit have recognized two types of seizures—investigatory stops requiring reasonable suspicion and arrests requiring probable cause. *Berry*, 670 F.2d at 591–92. The government contends that the seizure of defendants in the airport was an investigatory stop justified by reasonable suspicion. The officers did not transform the contact into a full scale arrest until after probable cause (in the form of cocaine) existed. The government does *not* contend that the requisite probable cause existed during the initial contact. Thus, the decisive issues are whether reasonable suspicion existed to support the seizure and whether the seizure transgressed the permissible bounds of an investigatory stop.

The articulable facts which aroused the suspicions of the officers in this case are: 1) Hanson and Garza paid cash for their tickets; 2) the tickets were one-way; 3) Hanson and Garza travelled to Miami, a known "source" city for drugs; 4) Hanson and Garza travelled under assumed names; 5) they appeared nervous and watchful. These characteristics match some of the elements of the so-called "drug courier profile" employed by the DEA and other law enforcement agencies to identify potential drug couriers. *United States v. Elmore*, 595 F.2d 1036, 1039 n. 3 (5th Cir.1979), *cert.*

---

**4.** At the suppression hearing, Sgt. Pinkston did not recall retaining Hanson's license but he did

not foreclose that possibility. Hanson testified that the license was retained.

denied, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

▮ This court noted in *Berry* that a match between the so-called profile and characteristics exhibited by a defendant does not, in and of itself, create a reasonable suspicion sufficient to justify an investigatory stop. *Berry*, 670 F.2d at 600. We reaffirm the importance of that conclusion today. Mere mechanical matching of characteristics thought to be common to all drug couriers can never meet the rigorous requirements of the fourth amendment. To be reasonable, an officer's suspicion must be specific and, to some extent, individualized to the particular characteristics exhibited by a particular person. *Id.* at 601, n. 22. As a consequence of this requirement, the airport cases tend to be very fact specific—reasonable suspicion may exist on one set of facts, but not on another. However, a review of some of the leading cases reveals that the facts of the present case more closely resemble those in which reasonable suspicion has been found to exist.

In *Reid v. Georgia*, the Supreme Court held that reasonable suspicion could not be supported by the following facts: 1) the defendant arrived from a known source city for drugs; 2) he arrived early in the morning, when law enforcement activity was at an ebb; 3) he tried to conceal the existence of a travelling companion; and 4) he and his companion carried no luggage other than shoulder bags. 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980). The Court noted that these facts "describe a very large category of presumably innocent travellers who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure." *Id.* at 441, 100 S.Ct. at 2754.

Similarly, this court could not find reasonable suspicion to support a seizure in *United States v. Glass*, 741 F.2d 83 (5th Cir.1984). The officers in that case relied on the following facts: 1) an officer had been informed that two individuals of a certain description would arrive in Shreve-

port; 2) the defendant arrived from Ft. Lauderdale, a source city for narcotics; 3) the defendant and the other individual recognized each other upon deplaning; 4) the other individual travelled under an assumed name. *Id.* at 85. The court held that "neither singly nor together did these facts afford the officers a particularized and subjective basis for reasonable suspicion to believe Glass was committing a crime." *Id.* at 86. Central to the court's concern was the notion that, aside from Glass' arrival from Ft. Lauderdale and his recognition of the other individual, none of the articulated facts raised a reasonable suspicion about Glass personally. *Id.*

In contrast, the *Berry* court found reasonable suspicion on the following observed facts: 1) the defendant arrived from a source city; 2) he appeared nervous; 3) he travelled under an assumed name; 4) he attempted to leave the airport by means of public transportation; 5) he tried to conceal the existence of a traveling companion. According to the court, "[c]onsidering these factors in light of the particular circumstances in which they appeared in this case, we believe that they could serve as the basis for a reasonable suspicion focused on Berry that would justify a seizure." *Berry*, 670 F.2d at 603.

The Supreme Court confronted the reasonable suspicion issue more recently in *Royer v. Florida*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). The officers detained the defendant in that case on the basis of the following circumstances: 1) Royer carried heavy American Tourister luggage; 2) he dressed casually and was apparently between age 25–35; 3) he appeared nervous and watchful; 4) he paid for a one-way ticket in cash (small bills); 5) he wrote only an assumed name and his destination on his baggage identification tag. *Royer*, 460 U.S. at 493–94, 103 S.Ct. at 1321–22. Eight justices agreed that these circumstances justified an investigatory detention of Royer. *Id.* at 502, 103 S.Ct. at 1326.

Soon after the Court's decision in *Royer*, the Seventh Circuit found reasonable suspi-

cion on facts similar to the present case. *United States v. Cordell,* 723 F.2d 1283 (7th Cir.1983). In *Cordell,* the defendant "had arrived from a major source city for narcotics. The name on his airline ticket did not match. He appeared to be extremely nervous, and became more nervous as the officers continued to question him." *Id.* at 1285. According to the *Cordell* court, the detaining officers were entitled to assess these circumstances in light of their experience in narcotics enforcement and to suspect the defendant of a violation of the drug laws. *Id.*

On the whole, we believe that the facts of this case more closely resemble those cases that found reasonable suspicion (*Berry, Royer* and *Cordell*) than those that did not (*Reid* and *Glass*). It must be remembered that Sgt. Pinkston and Agent Van Patten relied on more than just their own personal observation of Hanson and Garza. Pinkston had received information about the two men—that they were nervous, that they were travelling under assumed names and that they bought one-way cash tickets to Miami—before he and Van Patten began their own observation. Once the defendants arrived at DFW, they continued to exhibit suspicious behavior. They were nervous and watchful; Mr. Garza chain-smoked and paced about while waiting for the luggage, picking up a phone several times without making a call. Of course, these actions, standing alone, might be deemed consistent with innocent behavior.[5] But Sgt. Pinkston and Agent Van Patten were not mere ordinary observers. They were experienced in the area of narcotics enforcement. We are inclined to give "due credit ... to the experience and expertise" of these officers. *United States v. Regan,* 687 F.2d 531, 536 (1st Cir.1982).

■ Moreover, the officers received additional information before any fourth amendment seizure occurred. Their questioning of Hanson and Garza revealed the use of assumed names on defendants' airline tickets. The discrepancy between the names on the defendants' drivers licenses and the names on their tickets, when combined with all the other information that the officers had either personally observed or received from the officer in Houston, gave the officers reasonable suspicion sufficient to warrant a detention of Hanson and Garza.

■ A finding of reasonable suspicion does not end our analysis, however. Given that the officers had valid grounds for an investigatory stop, we must ascertain whether the officers transformed the encounter into a full scale arrest before the existence of probable cause. We believe that an arrest did not take place until after the officers discovered the cocaine. Since Hanson and Garza consented to the search of their luggage during a valid investigatory stop, the evidence obtained was not illegally discovered and thus properly admitted at defendants' trial.[6]

The line between a valid investigatory stop and an arrest requiring probable cause is a fine one. As the Supreme Court pointed out in *Royer,* "there is [not] a litmus paper test for ... determining when a seizure exceeds the bounds of an investigatory stop." *Royer,* 460 U.S. at 506, 103 S.Ct. at 1329. Nonetheless, the plurality opinion noted that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purposes of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Id.* at 500, 103 S.Ct. at 1325.

---

**5.** *But see Berry,* 670 F.2d at 600, n. 21 ("We recognize the administrative utility of the drug courier profile in guiding law enforcement officers toward individuals on whom the officers should focus their attention in order to determine whether there is a basis for a specific and articulable suspicion that the particular individual is smuggling drugs.").

**6.** The government suggested at oral argument that the discovery of the protruding shotgun barrel might have provided a justification for the search even in the absence of consent. Since we have concluded that the consent was not tainted by an illegal arrest, we express no view on this notion.

The latest pronouncement from the Supreme Court on the scope of investigatory stops is *United States v. Sharpe*, 470 U.S. 675, 105 S.Ct. 1568, 84 L.Ed.2d 605 (1985). In *Sharpe*, although not an airport case, the Court offered the following guidepost for determining the propriety of an investigatory stop generally: "In assessing whether a detention is too long in duration to be considered an investigative stop, we consider it appropriate to examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Sharpe*, 105 S.Ct. at 1576. A twenty minute detention of the defendant in *Sharpe* passed muster under this standard.

▮▮▮ The officers in this case detained Hanson and Garza for at least five to ten minutes and at most twenty minutes.[7] They proceeded expeditiously in their questioning of the defendants and in their search of the luggage. Drug-sniffing dogs may have been a less intrusive option, but that possibility alone cannot defeat the validity of the investigation.[8] Moreover, defendants were detained in a public, highly-trafficked area—there is no indication of the type of movement or confinement found objectionable in *Royer*.[9] We cannot say that the detention exceeded the permissible bounds of an investigatory stop.

This conclusion does not conflict with our decision in *United States v. Morin*, 665 F.2d 765 (5th Cir.1982). As we noted at the outset of *Morin*, it was a case "very different from the many airport stop cases with which this Court has been presented." *Morin*, 665 F.2d at 768. In *Morin*, the defendant had been stopped twice in two different airports. At DFW, Morin's luggage had been checked by drug sniffing dogs and he had been questioned by officers. *Id.* at 761. The DFW officers allowed Morin to proceed to Austin where he was placed under surveillance upon deplaning. Morin entered a public restroom and soon found himself in the presence of four law enforcement officers. As the court noted,

The details of this second stop are crucial to a determination of this case. Appellee Morin was literally caught with his pants down in an otherwise empty public restroom. Four officers were involved in the stop.... One of the officers ... told defendant that he was suspected of carrying narcotics and asked him to produce identification, which he did. Morin's airline ticket was also confiscated at this time.

*Id.* at 769. The *Morin* court held that these actions by the officers effectively placed Morin under arrest.

The present case is thus readily distinguishable from *Morin*. Defendants had not previously been stopped and questioned.[10] Their encounter with the officers took place in a visible public place without the same circumstances of vulnerability present in *Morin*.

*Sufficiency of the Evidence*

▮▮▮ Hanson's sufficiency of the evidence claim is without merit. In reviewing such a claim, this court will "view the evidence in the light most favorable to the judgment and, deferring to reasonable inferences of fact drawn by the trial court, will determine whether a reasonable trier of fact could have found that the evidence established guilt beyond a reasonable doubt." *United States v. Reeves*, 782 F.2d 1323, 1326 (5th Cir.1986). In the present

---

**7.** These figures represent the range of time testified to by the officers and the defendants.

**8.** *See Sharpe*, 105 S.Ct. at 1576:

A creative judge engaged in post hoc evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.... The question is not simply whether some alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.

**9.** *Royer*, 460 U.S. at 502–03, 103 S.Ct. at 1326–27 ("[officers] requested him to accompany them to the police room. Royer went with them. He found himself in a small room ... equipped with a desk and 2 chairs. He was alone with two police officers....").

**10.** *See supra* note 1.

case, there is clearly sufficient evidence to support Hanson's conviction on the conspiracy count. Hanson and Garza travelled together to Miami and used the same last name. The evidence indicated that both defendants admitted ownership of the cocaine seized from them. All the facts and circumstances here add up to an agreement between Hanson and Garza to possess cocaine with the intent to distribute.

AFFIRMED.