UNITED STATES of America

v.

Robert Martin GALLAGHER.

Crim. No. 4–86–211–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

April 28, 1989.

J. Michael Worley, Fort Worth, Tex., for U.S.

Gerhard Kleinschmidt, Fort Worth, Tex., for defendant.

## MEMORANDUM OPINION AND ORDER

MAHON, District Judge.

Defendant Robert Martin Gallagher has been indicted for possession of approximately 54.8 grams of cocaine, a Schedule II narcotic drug controlled substance, in violation of 21 U.S.C. Section 841(a)(1). Gallagher was also indicted by the State of Texas. However, as the result of a suppression hearing in the Criminal District Court No. 5 of Dallas County, Texas, before the Honorable Judge Pat McDowell, the action resulted in dismissal because the

airport stop violated Texas law.[1] A hearing was held on Defendant's motion to suppress which the Court now considers.

## FINDINGS OF FACT

On July 17, 1986, at approximately 11:50 a.m., Defendant Robert Martin Gallagher arrived at the Dallas/Fort Worth International Airport ("DFW") on Braniff Flight # 559, a direct flight from Miami, Florida. Drug Task Force Officers W.D. Glenn and Norman Wyatt observed Defendant Gallagher disembark the plane at Gate 8, Terminal 2W, carrying a gray, soft-sided bag. While Officer Glenn stated in his case report that the bag appeared to be almost empty, he testified at the suppression hearing that there was nothing unusual about the bag, which appeared to be half full with clothing. According to Officer Glenn, Gallagher "appeared to be nervous" at this time because he was looking around the airport unlike any other passenger, was making eye contact with everyone in the area, and was looking over his shoulder as he walked down the concourse. Glenn watched as Gallagher passed by one public restroom near Gate 8 before entering another restroom near Gate 5 where he remained for approximately 8 to 10 minutes. At this point, there appears to be an inconsistency in whether Glenn waited outside the restroom with Officer Wyatt or whether he followed Gallagher inside the restroom. At the hearing in this Court, Glenn testified that he waited outside with Officer Wyatt. However, Glenn's case report states that Gallagher entered the restroom and "was observed in a booth inside." When Officer Glenn appeared in the State Court suppression hearing, he also testified that he followed Gallagher inside the restroom. When Gallagher left the restroom, he walked to a bar in the airport, ordered a drink, and turned his barstool around away from the bar while drinking his cocktail. Gallagher was looking at the people passing by the bar. After 7 to 10 minutes in the bar, Gallagher left the bar, walked toward Gate 8 where he had deplaned and entered a different restroom. At this point Officer Glenn entered the otherwise empty restroom close behind Gallagher. While Gallagher stood at the mirror, Glenn approached Gallagher, identified himself as a DEA agent and displayed his badge. After Gallagher agreed to speak with him, Glenn asked to see Gallagher's airline ticket and Gallagher handed it to him. The ticket was a cash, round-trip ticket in Gallagher's name from Kansas City, Missouri to Miami, Florida, purchased on July 16, 1986, and had an open return provision. There were no luggage tickets attached to the ticket. Glenn returned the ticket to Gallagher and requested his identification. Gallagher had no identification. At this time Glenn introduced Task Force Officer Norman Wyatt as his partner, and stated that they were working narcotics at the airport and asked Gallagher if they could look in his bag. Gallagher appeared very nervous, as his voice was quivering and he became flushed. Gallagher allowed Officer Glenn to look in the bag wherein Glenn discovered a plastic baggie containing a white powdery substance—which he later learned was 89% cocaine—and a piece of paper with "54 grams without bag" written on it. Glenn seized the substance and arrested Gallagher.

## CONCLUSIONS OF LAW

▮ The Court must first determine whether the Fourth Amendment was implicated. Not every police-citizen contact implicates the Fourth Amendment.[2] The Supreme Court has set forth three tiers of police-citizen contact within the context of the Fourth Amendment;[3] (1) mere communication between a citizen and an officer involving no element of detention or coercion;[4] (2) brief detentions or investigatory

---

1. *See Daniels v. State,* 718 S.W.2d 702 (Tex. Crim.App.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 277, 93 L.Ed.2d 252 (1986), *overruled by, Juarez v. State,* 758 S.W.2d 772 (Tex.Crim.App.1988).

2. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

3. *See United States v. Berry,* 670 F.2d 583, 591 (5th Cir.1982).

4. *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

stops;[5] and (3) full scale arrests.[6] While mere communications do not implicate the Fourth Amendment, a full scale arrest must be supported by probable cause. The Fourth Amendment is implicated in the context of a detention or investigatory stop which need only be supported by a "reasonable suspicion" based on "specific articulable facts which, taken together with reasonable inferences from these facts, warrant an intrusion."[7]

## A. *When Did a Seizure Occur?*

■ In *United States v. Berry*, 670 F.2d 583 (5th Cir.1982), the Fifth Circuit, sitting en banc, adopted Justice Stewart's gauge for determining when a seizure occurs, as articulated in *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed. 2d 497 (1980). A seizure has occurred if "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 554, 100 S.Ct. at 1877. The Court determines that a seizure occurred at the point that Officer Glenn identified himself and his partner, Officer Wyatt, as narcotics officers and asked to look inside the Defendant's bag.

In considering the coercive acts of a police officer, the Fifth Circuit has instructed trial courts, by looking at the totality of the circumstances of an airport stop, to use close scrutiny in determining whether the circumstances reveal the presence of coercion. *Berry*, 670 F.2d at 597. The *Berry* Court suggested several significant factors which should be accorded great weight in evaluating the circumstances surrounding the airport stop. Where officers block an individual's path to prevent his progress in any way, including the placing of implicit constraints on an individual's freedom, an individual may feel that he is not free to leave.[8] Likewise, statements by officers that individuals are suspected of smuggling drugs or which intimate that an individual is the focus of an investigation may also lead a reasonable individual to feel that he is not free to leave.[9]

Gallagher was approached by the two narcotics officers while standing at a mirror in a small public restroom. Gallagher was situated such that there was a wall in front of him, a wall to one side, Officer Glenn to his other side, and Officer Wyatt behind him next to the restroom stalls. The physical constraints, together with the statements made by the officers that they were working narcotics, lead the Court to conclude that a reasonable person would not have believed that he was free to leave.[10] Indeed, the government does not disagree that a seizure occurred at this time.[11]

## B. *Reasonable Suspicion*

Once a stop has been held a seizure, the protections of the Fourth Amendment have been implicated and the search can be constitutional only if the seizure is supported

**5.** *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975).

**6.** *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

**7.** *Terry v. Ohio*, 392 U.S. at 21, 88 S.Ct. at 1880.

**8.** *See Berry*, 670 F.2d at 597 (citing *United States v. Bowles*, 625 F.2d 526 (5th Cir.1980); and *United States v. Elmore*, 595 F.2d 1036 (5th Cir.1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980)).

**9.** *See Berry*, 670 F.2d at 597 (citing *United States v. Robinson*, 625 F.2d 1211 (5th Cir.1980)).

**10.** For analogous Fifth Circuit cases, *see United States v. Gonzales*, 842 F.2d 748 (5th Cir.1988) (at the time the officer informed the Defendant that he was "working narcotics" and requested to look in her bag, a reasonable person would no longer have felt free to leave); *United States v. Hanson*, 801 F.2d 757 (5th Cir.1986) (when officer asked Defendant to step aside, apparently retained his driver's license, and informed him that he was suspected of carrying drugs, a reasonable person would not have believed that he was free to go). *See also, United States v. Price*, 680 F.Supp. 833 (N.D.Tex.1988) (seizure occurred when officer identified himself as a narcotics officer and asked the Defendant if he could retrieve and search his luggage).

**11.** Government's Answer to Defendant's Motion to Suppress, Page 3, paragraph III: "At least until the officer asked for permission to examine defendant's bag, no seizure occurred," citing *Hanson* at 761.

by reasonable suspicion.[12] A reasonable suspicion analysis involving an airport stop inevitably calls into play certain factors known as "drug courier profile" factors.[13] In *Berry*, the Fifth Circuit addressed the role of drug courier profile factors in the reasonable suspicion determination. The Court characterized the profile as "nothing more than an administrative tool of the police. The presence or absence of a particular characteristic on any particular profile is of no legal significance in the determination of reasonable suspicion."[14]

The Supreme Court has most recently spoken on the issue of what constitutes reasonable suspicion in the context of an airport stop in *United States v. Sokolow*, —— U.S. ——, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The Supreme Court rejected the Ninth Circuit's two-part test for establishing reasonable suspicion wherein the Ninth Circuit separated facts of "ongoing criminal activity" and facts describing "personal characteristics." Without a showing of ongoing criminal activity, the personal characteristics of drug couriers were considered by the Ninth Circuit to be irrelevant. There could be no finding of reasonable suspicion without at least one factor of ongoing criminal activity. In rejecting the two-part test as unnecessarily drawing "a sharp line between types of evidence, the probative value of which varies only in degree," the Court reemphasized the use of the "totality of the circumstances" test set forth in *United States v. Cortez*, 449 U.S. 411, 417, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). However, in addressing the role of profile characteristics in the totality of the circumstances, the Supreme Court held that the fact that some of the factors relied upon in determining reasonable suspicion were drug courier profile factors "does not somehow detract from their evidentiary significance as seen by a trained agent."[15]

■ In determining whether there was sufficient reasonable suspicion based on specific articulable facts to support the detention, the Court must consider the "totality of the circumstances—the whole picture." *Cortez*, 449 U.S. at 417, 101 S.Ct. at 695. "Based upon the whole picture the detaining officers must have a particularized and objective basis for suspecting the particular person stopped of criminal activity."[16]

■ Applying the totality of the circumstances test to the present case, based on all the facts known to the officers at the time of the seizure, the Court finds that the officers did not have a reasonable suspicion to believe the Defendant was involved in criminal activity. The officers' suspicions were based only upon those facts known at the time Officer Glenn identified himself and Officer Wyatt as narcotics officers and requested to look in Defendant's bag. The circumstances known to the officers at that time were that the Defendant: (1) appeared nervous; (2) arrived from a direct flight from Miami, a known source city; (3) traveled on a cash ticket purchased the previous day with an open return; and (4) trav-

---

**12.** *See Berry*, 670 F.2d at 598.

**13.** The seven primary factors are: (1) arrival from or departure to an identified source city; (2) carrying little or no luggage, or large quantities of empty suitcase; (3) unusual itinerary, such as rapid turnaround time for a very lengthy airplane trip; (4) use of an alias; (5) carrying unusually large amount of currency in the many thousands of dollars, usually on their person, in briefcases or bags; (6) purchasing airline tickets with a large amount of small denomination currency; and (7) unusual nervousness beyond that ordinarily exhibited by passengers.

The secondary characteristics are: (1) the almost exclusive use of public transportation, particularly taxicabs, in departing from the airport; (2) immediately making a telephone call after deplaning; (3) leaving a false or fictitious callback telephone number with the airline being utilized; and (4) excessively frequent travel to source or distribution cities. *United States v. Elmore*, 595 F.2d 1036, 1039 n. 3 (5th Cir.1979), *cert. denied*, 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1980).

**14.** *Berry*, 670 F.2d at 600.

**15.** *Sokolow*, —— U.S. at ——, 109 S.Ct. at 1587.

**16.** *Cortez*, 449 U.S. at 417–18, 101 S.Ct. at 694–95 (citing *Brown v. Texas*, 443 U.S. 47, 51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979); and *United States v. Brignoni–Ponce*, 422 U.S. 873, 884, 95 S.Ct. 2574, 2581, 45 L.Ed.2d 607 (1975)).

elled without checked luggage and without identification.

The officers had no prior information from any other source that the Defendant was involved in illegal activity;[17] they had no knowledge of whether the Defendant purchased the ticket with small denominations of currency;[18] and there was no evidence that the Defendant was attempting to conceal facts from the officers concerning his true identity or the circumstances of his travel. Courts have given particularly great significance to circumstances where individuals deliberately attempt to mislead law enforcement officers as to their true identity, travel companions or details of their travel. *See Berry*, 670 F.2d at 603–604, where the court considered as a critical consideration the fact that the Defendant deliberately misled the officers concerning his traveling companion and concerning his true identity; *Hanson*, 801 F.2d at 763, where the use of assumed names, when combined with all the other information that the officers had either personally observed or received from an officer in Houston supported reasonable suspicion; *Florida v. Royer*, 460 U.S. 491, 493–94, 103 S.Ct. 1319, 1321–22, 75 L.Ed.2d 229 (1983), where the defendant wrote only an assumed name and his destination on his baggage identification tag; and *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984), where the name on defendant's airline ticket did not match the name on his driver's license.

Moreover, the fact that Gallagher had no identification does not in itself give rise to reasonable suspicion. This case is closely analogous to a case emanating from this Court just last year. In *United States v. Gonzales*, 842 F.2d 748 (5th Cir.1988), the defendant arrived at DFW from Miami, on a flight frequently traveled by drug smugglers; the defendant appeared nervous and watchful; carried little luggage—only a gym bag; dressed loudly in a black and yellow shorts outfit; did not produce any identification; and "most importantly, Gonzales deliberately attempted to mislead law enforcement officials by claiming that she was remaining in the Dallas–Fort Worth area for two to three days when in fact her return ticket indicated that her departure was on a return flight that same afternoon." *Id.* at 753. Although Gallagher did not have identification, he was not using an alias and he did not try to otherwise mislead the officers—a fact of significant importance to the court in *Gonzales*.

The totality of the factors relied upon by the government simply do not constitute the type of particularized and objective basis to support a belief by the law enforcement officers that Gallagher was involved in criminal activity. These factors do, however, describe "a very large category of presumably innocent travelers who would be subject to virtually random seizures were the Court to conclude that as little foundation as there was in this case could justify a seizure."[19]

### C.  *Consent*

There is no dispute but that Gallagher gave his permission to Officer Glenn to search his bag. However, in order to purge the taint of an illegal detention, the government must show that the consent was both voluntary for purposes of the Fifth Amendment and that it was not the product of the illegality for purposes of the Fourth Amendment. The Court finds that Gallagher's consent was voluntarily given, uncoerced by any flagrant official misconduct.

### D.  *Fruit of the Poisonous Tree*

■ The question thus becomes whether the consent was the fruit of the illegal

---

**17.** *Cf. Hanson*, 801 F.2d 757, 763 (the court found reasonable suspicion, noting, "[i]t must be remembered that [the officers] relied on more than just their own personal observations of [the defendants]."); and *Berry*, 670 F.2d at 603–604 (officers had prior knowledge that the Defendant had the name of a drug smuggler for whom they had been told to watch).

**18.** *Compare Sokolow* —— U.S. at ——, 109 S.Ct. at 1585, where the officers knew that the defendant paid $2,100.00 in cash out of a roll of twenty-dollar bills which appeared to contain a total of $4,000.00.

**19.** *Reid v. Georgia*, 448 U.S. 438, 441, 100 S.Ct. 2752, 2754, 65 L.Ed.2d 890 (1980).

detention.[20] The exclusionary rule "extends as well to the indirect as the direct products" of unconstitutional conduct.[21] The nexus, or causal connection, between the illegal seizure and the voluntary search must be sufficiently attenuated in order to permit the use of the cocaine obtained as a result of the search at trial. The factors to be considered include the temporal proximity of the seizure and the consent, the presence of intervening circumstances, and, particularly, the purpose and flagrancy of the official misconduct.[22] The Court finds no attenuation of taint. Consent was proffered immediately after and as a direct result of the illegality, without any intervening event. Indeed, this is a case where the evidence was obtained as a direct result of an unconstitutional seizure and "plainly subject to exclusion."[23]

## CONCLUSION

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, **shall not be violated.**...

U.S. Const. amend. IV.

The Court concludes by making it abundantly clear that it considers those who transport illegal drugs into our society to be the most loathsome and despicable of our citizens. These individuals infiltrate our schools and our communities with their evil designs, motivated by greed, to invade the healthy bodies and minds of our children. While brave members of our society fight the war on drugs, court dockets overflow, and prisons become unreasonably overcrowded, we must be ever mindful of our responsibilities of preserving the guarantees of the Constitution. Law enforcement officers must not overstep the bounds of the Fourth Amendment in their zeal for effective law enforcement, just as the courts must continue to exercise their "unflagging duty to strike down official activity that exceed the confines of the Constitution."[24] The protections of the Fourth Amendment reach all persons, whether accused of crime or not, and "the duty of giving to it force and effect is obligatory upon all intrusted under our Federal system with the enforcement of the laws." *Weeks v. United States*, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). As Justice Marshall recently noted in *United States v. Sokolow*, —— U.S. ——, ——, 109 S.Ct. 1581, 1587, 104 L.Ed.2d 1 (1989) (Marshall, J., dissenting), "because the strongest advocates of Fourth Amendment rights are frequently criminals, it is easy to forget that our interpretations of such rights apply to the innocent and the guilty alike." *Id.* at ——, 109 S.Ct. at 1587. It is the obligation of every law enforcement officer in our country and of every judge not to forget the rights which make ours a free society.

## ORDER

In view of the foregoing, Defendant Gallagher's motion to suppress the evidence identified in the indictment is GRANTED. Because the suppressed matters appear to be essential to prosecution, counsel are directed to appear at a status call at 9 A.M., May 15, 1989, to discuss any anticipated further proceedings. Defendant Gallagher's presence at that status call is waived.

---

**20.** *See Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

**21.** *Segura v. United States*, 468 U.S. 796, 804, 104 S.Ct. 3380, 3385, 82 L.Ed.2d 599 (1984) (quoting *Wong Sun v. United States*, 371 U.S. 471, 484, 83 S.Ct. 407, 415, 9 L.Ed.2d 441 (1963)).

**22.** *Dunaway v. New York*, 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979) (citing *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975)); *see United States v. Wilson*, 569 F.2d 392 (5th Cir.1978) (applying the *Brown* factors where the evidence has been obtained by means of a consent to search rather than a confession).

**23.** *Segura*, 468 U.S. at 804, 104 S.Ct. at 3385.

**24.** *Florida v. Royer*, 460 U.S. at 512, 103 S.Ct. at 1332 (Brennan, J., concurring).