**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Natalia GONZALES,
Defendant–Appellant.**

No. 87–1157.

United States Court of Appeals,
Fifth Circuit.

April 1, 1988.

---

5. 622 F.2d at 190.

Gary Kleinschmidt, George R. Trimber, Fort Worth, Tex., for defendant-appellant.

Marvin Collins, U.S. Atty., Ft. Worth, Tex., Sidney Powell, Frederick M. Schattman, Asst. U.S. Attys., Dallas, Tex., for plaintiff-appellee.

Before VAN GRAAFEILAND,* JOHNSON, and JOLLY, Circuit Judges.

JOHNSON, Circuit Judge:

Defendant Natalia Gonzales entered a conditional plea of guilty to the charge of knowingly and intentionally possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1). In doing so, Gonzales reserved her right to appeal the dis-trict court's denial of her motion to suppress evidence obtained from her following an investigatory stop by Drug Enforcement Agency (DEA) officers at the Dallas/Ft. Worth Airport. Because the record demonstrates that the DEA officers possessed sufficient reasonable suspicion to briefly detain Gonzales and the record further reflects that Gonzales' consent to the search of her bag was freely and voluntarily given, we affirm.

I. *Facts and Procedural History*

At approximately 9:15 a.m. on August 22, 1986, three DEA agents observed defendant Natalia Gonzales disembark from a non-stop flight from Miami, Florida. Carrying only a gym bag, Gonzales proceeded to walk slowly to a restroom located approximately fifty yards from Gate 20, the gate at which Gonzales had exited. As she was walking to the restroom, Gonzales looked around the terminal as if she expected to meet someone. Gonzales left the restroom after a few minutes and walked slowly past Gate 20 to a set of telephones, whereupon she made a call lasting approximately ten minutes. Thereafter, Gonzales walked to another set of telephones which was located in a gate area across from the restroom and remained in that area for two or three minutes. Because of their vantage point, the DEA officers were unable to observe whether or not Gonzales used a telephone in that area. Gonzales next entered a gift shop, remaining only for a short time and not purchasing any items.

After leaving the gift shop, Gonzales exited the "secured" area of the terminal into the baggage claim area. Gonzales then walked directly through the baggage claim area, down an escalator leading into a parking area, and immediately returned to the baggage area by traveling back up the adjoining escalator. Moving over to another set of phones in the baggage area, Gonzales made a call lasting approximately thirty minutes. Gonzales next walked back to the escalator which she had previously used and then back to the group of phones. At no time during her movements did Gon-

* Circuit Judge of the Second Circuit, sitting by designation.

zales attempt to claim any baggage in the baggage area.

After observing Gonzales' movements and finding them suspicious, two of the three DEA officers approached Gonzales. By the time the officers approached Gonzales, approximately forty-five minutes had elapsed since Gonzales disembarked from the plane. One of the DEA officers, Officer Glenn, displayed his identification and told Gonzales he was with the DEA. During this exchange, the other DEA officer who had approached Gonzales stood directly behind Glenn. Glenn stood approximately 6'1" tall and weighed 280 pounds. The other officer was of comparable height but weighed 175 pounds. Gonzales stood approximately 5'4". When the two officers approached her, Gonzales was the only person in the baggage area and was standing near a corner and a bank of telephones.

After identifying himself, Glenn asked Gonzales whether he could speak with her for a minute. Glenn noticed that Gonzales appeared nervous, that her voice was cracking, and that her hands were trembling. Gonzales agreed to speak with Glenn and thereafter, Glenn requested to see Gonzales' airline ticket. Gonzales handed Glenn her ticket which was in the name of "Mrs. Garza." When Glenn asked Gonzales for some identification, Gonzales replied that she had lost her identification. Glenn then asked Gonzales how long she was going to stay in the Dallas/Ft. Worth area. Gonzales responded that she would remain in the area for several days. At this juncture, Glenn noticed that Gonzales' statement as to her length of stay in the area was inconsistent with Gonzales' ticket which indicated that she was scheduled on a return flight to Miami that same afternoon.

Thereafter, Glenn informed Gonzales that he was "working narcotics" and requested permission to look in her gym bag. Gonzales gave Glenn her permission, whereupon Glenn opened the bag and found clear plastic bags of white powder. At this point, Gonzales was arrested and taken to a nearby office. After being informed of her Miranda rights, Gonzales was asked whether she was carrying any other drugs. Gonzales responded that she was and revealed approximately 1000 grams of cocaine contained in plastic bags on her person.

Gonzales was indicted on September 9, 1986, on a single count of possession of cocaine with intent to distribute. Thereafter, Gonzales filed two motions to suppress the evidence seized from her bag and from her person as a result of the stop by the two DEA officers at the airport. After a hearing, the district court entered an order denying Gonzales' motion to suppress. Gonzales subsequently entered a conditional plea of guilty, reserving her right to appeal the district court's ruling on her motion to suppress and received a suspended sentence of five years imprisonment and a $3,000 fine. Gonzales now appeals the district court's order.

## II.   *Discussion*

### A.   *Validity of the Stop*

Initially, Gonzales contends that, from its inception, her encounter with the DEA officers amounted to a "seizure" not supported by reasonable suspicion and therefore, constituted a violation of the fourth amendment. The government maintains that the relevant contact between Gonzales and the officers did not exceed "mere communication"; thus, the fourth amendment was not implicated. The government further asserts that even if the investigatory stop constituted a "seizure" within the context of the fourth amendment, the stop was constitutionally valid as the officers possessed the requisite reasonable suspicion to justify the stop.

The seminal opinion in this Circuit on the interplay of airport drug stops and the fourth amendment is *United States v. Berry*, 670 F.2d 583 (5th Cir.1982) (en banc). In *Berry*, this Court carved out three tiers of police-citizen encounters:

[1] communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, [2] brief "seizures" that must be supported by reasonable suspicion, and [3] full-scale arrests

that must be supported by probable cause.

*Id.* at 591. Recognizing the unique character of airport stops and weighing the intrusion of such stops on an individual's fourth amendment interest against the government interest, the *Berry* Court rejected the proposition that all airport stops are "seizures" implicating the fourth amendment. Rather, the Court concluded that "airport stops of individuals by police, if of extremely restricted scope and conducted in a completely non-coercive manner, do not invoke the Fourth Amendment." *Id.* at 594. However, while extolling citizen cooperation with police, the Court in *Berry* cautioned that the delicate balance of government and individual interests in airport stops weighs in favor of the individual if law enforcement officials do more than identify themselves and briefly inquire if an individual is willing to speak with police. *Id.* at 595. The more intrusive the communication between the police and a citizen, the more likely that encounter is a "seizure" which must be supported by reasonable suspicion.

In describing the narrow range of circumstances in which a permissible airport stop may occur, the *Berry* Court initially concluded that a statement that a person is a law enforcement officer is not alone so coercive as to render an encounter between a citizen and police a seizure. *Id. See also Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983). By conducting an airport stop in an "appropriately deferential manner" and by ascertaining whether an individual is willing to talk to police, a law enforcement officer may effectively elicit information without simultaneously working a significant intrusion on an individual's liberty interest. *Berry,* 670 F.2d at 595. Such cooperative exchanges between citizens and police significantly aid law enforcement efforts in our society.

Thus, adopting Justice Stewart's definition of a "seizure" set forth in *United States v. Mendenhall,* 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the Court in *Berry* concluded that an airport stop becomes so intrusive as to escalate into a seizure necessitating reasonable suspicion only if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Id.* at 595 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877). While noting that the resolution of any fourth amendment challenge to an airport stop is necessarily a fact-intensive inquiry, the *Berry* Court did set forth several factors on which a court "should place great weight" in determining when, under the totality of the circumstances, enough coercion by police is present as would stimulate a belief in a reasonable person that he was not free to leave. Specifically, if law enforcement officials block an individual's path or otherwise intercept him to prevent his progress, this Court has declared such conduct by the police to be a factor of "great, and probably decisive, significance." *Id.* at 597. While much more subtle and difficult to discern, implicit constraints on an individual's freedom, such as retaining a person's ticket for more than a minimal amount of time, are also indicative of the type of coercion transforming a brief encounter into a fourth amendment "seizure." Finally, statements by police that intimate that an investigation has focused on a particular individual, or that an innocent individual would certainly cooperate with police, could easily communicate to a reasonable person that he is not free to leave. *Id. See also United States v. Hanson,* 801 F.2d 757, 761 (5th Cir.1986).

■ In the instant case, the district court concluded that Gonzales was not seized within the meaning of the fourth amendment until her arrest which occurred after Glenn discovered the white powdery substance in Gonzales' gym bag. Prior to Gonzales' arrest, the district court reasoned that Glenn and Gonzales were engaged in "mere communication" and that, under the circumstances, a reasonable person would have believed she was free to leave. The district court further concluded that even if Gonzales was seized at the time Glenn had Gonzales' ticket in his possession, the DEA officers had sufficient reasonable suspicion even at that time to

justify their brief detention of Gonzales. Therefore, the district court held that Gonzales' fourth amendment rights were not violated. After careful consideration of the record, we affirm the district court's conclusion that the fourth amendment was not transgressed by the actions of the DEA officers in this case; however, we disagree with the district court's holding that a "seizure" did not occur until the moment of Gonzales' arrest. Applying the *Berry* criteria and comparing subsequent cases decided by this Court involving airport stops, we conclude that Gonzales was seized at the moment Glenn informed her he was "working narcotics" and requested to look in her gym bag. Prior to that time, Glenn was merely communicating with Gonzales.

The facts of the instant case are that Officer Glenn approached Gonzales, identified himself, and requested permission to speak with Gonzales. After Gonzales agreed to speak with him, Glenn asked to see Gonzales' airline ticket. The district court found that the officers did not intimidate Gonzales and that the questioning occurred over an abbreviated period of only two minutes.[1] Gonzales testified at the suppression hearing that Glenn never threatened her or touched her in any way. Glenn also did not raise his voice with Gonzales, but spoke in a normal tone. Moreover, Gonzales was not confined to a small area, but was in an open public area. In *Berry*, this Court determined that where the officers approached the suspected individual, asked to speak with him, and requested identification, the fourth amendment was not implicated. *Berry*, 670 F.2d at 603. In *United States v. Hanson*, this Court concluded that a fourth amendment seizure did not take place where the officers merely approached the defendant, displayed their badges, and asked questions. 801 F.2d at 761.

Further, Officer Glenn did not physically touch Gonzales in any way, nor did he request Gonzales to accompany him or to step aside. Physical contact or a request

that an individual move in some manner has been consistently regarded by this Court as persuasive evidence that a fourth amendment seizure has occurred. *See Hanson*, 801 F.2d at 761 (Where officers asked individual to step aside, retained that individual's drivers license, and informed individual he was suspected of carrying drugs, a reasonable person would not have believed that he was free to go and a seizure occurred.); *United States v. Glass*, 741 F.2d 83 (5th Cir.1984) (Where individuals were requested to step to the side of the escalator and to step out of the line of passenger traffic and informed they were suspected of illegal drug activity, such individuals were seized within the meaning of the fourth amendment.); *United States v. Rojas*, 671 F.2d 159, 164 (5th Cir.1982) (Where individual was requested to step out of the jet port, a fourth amendment seizure occurred.).

Thus, prior to her arrest, Gonzales was engaged in mere communication with Glenn, perfectly permissible under the fourth amendment. However, at the time Glenn informed Gonzales that he was "working narcotics" and requested to look in her bag, a reasonable person would no longer have felt free to leave. As noted previously, a statement by a law enforcement official that an individual is suspected of illegal activity is persuasive evidence that the fourth amendment has been implicated. *See Royer*, 460 U.S. at 496, 103 S.Ct. 1323; *Glass*, 741 F.2d at 85; *Rojas*, 671 F.2d at 164. In the instant case, Glenn implicitly informed Gonzales that she was a suspect in a drug investigation when he told her he was "working narcotics." This fact, combined with the other circumstances attending the stop of Gonzales, compel a conclusion that Gonzales was seized at the time Glenn revealed that he was "working narcotics" and requested to look in her gym bag.

▪ Having determined that Gonzales was seized for purposes of the fourth

---

**1.** "In reviewing a trial court's decision on a suppression motion, we accept the court's factual findings unless clearly erroneous and view the evidence in the light most favorable to the

party prevailing on the motion." *United States v. Hanson*, 801 F.2d 757, 760 n. 3 (5th Cir.1986) (citation omitted).

amendment, our inquiry now becomes whether that seizure was supported by reasonable suspicion on the part of the detaining officers. Reasonable suspicion has been defined by the Supreme Court as "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). *See also Berry*, 670 F.2d at 598. The articulable facts relied upon by the DEA officers in the instant case to form the "reasonable suspicion" supporting their detention of Gonzales are that: (1) Gonzales arrived from Miami, Florida, a known source city for drugs on a flight which had been involved in approximately 60 percent of the cocaine seized at the Dallas/Ft. Worth Airport the preceding year; (2) Gonzales appeared nervous and watchful, walking slowly around the terminal after leaving the plane and appearing as if she were expecting to meet someone; (3) Gonzales carried little luggage—only a gym bag—after traveling a long distance; (4) Gonzales was dressed loudly in a black and yellow shorts outfit; (5) Gonzales did not produce any identification when requested to do so by the officers; and (6) most importantly, Gonzales deliberately attempted to mislead law enforcement officials by claiming that she was remaining in the Dallas/Ft. Worth area for two to three days when in fact her return ticket indicated her departure was on a return flight that same afternoon. To establish the reasonable suspicion necessary to justify the detention of an individual for fourth amendment purposes, "some quantum of individualized suspicion" on the particular individual seized is required. *United States v. Martinez-Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 3084, 49 L.Ed. 2d 1116 (1976); *Berry*, 670 F.2d at 600.

We conclude that the facts of the present case, taken collectively, provided the DEA officers sufficient reasonable suspicion to render their brief detention of Gonzales constitutionally valid.[2]

In the instant case, Gonzales was dressed loudly, was of a young age, appeared nervous and watchful, carried only a gym bag for a lengthy trip, and attempted to mislead law enforcement officials as to the length of her stay in the Dallas/Ft. Worth area. In a recent case by the Supreme Court upholding the validity of an airport drug stop, *Florida v. Royer*, the Court found reasonable suspicion present where the defendant carried heavy luggage, dressed casually, was between the age of 25 and 35, appeared nervous and watchful, paid for a one-way ticket in small bills cash, and wrote only an assumed name and destination on his baggage identification. Comparing the facts of the instant case to those in *Royer* and other decisions by this Court involving airport drug stops, we conclude that the DEA officers had reasonable suspicion to briefly detain Gonzales. *See Hanson*, 801 F.2d 757; *Glass*, 741 F.2d 83; *United States v. Ehlebracht*, 693 F.2d 333 (5th Cir.1982); *Rojas*, 671 F.2d 159. In reaching this conclusion, we find particularly significant the fact that Gonzales deliberately sought to deceive the officers as to the true duration of her stay in the area. *See Hanson*, 801 F.2d at 763; *Berry*, 670 F.2d at 603–04. Moreover, law enforcement officials are entitled to evaluate the specific and articulable facts known to them in light of their experience in narcotics enforcement, and "[w]e are inclined to give 'due credit ... to the experience and expertise' of these officers." *Hanson*, 801 F.2d at 763 (*quoting United States v. Regan*, 687 F.2d 531, 536

2. We recognize that several of the facts relied upon by the officers in the instant case to form their reasonable suspicion of Gonzales match those listed in the "drug courier profile" condemned by this Court as a mechanistic device which should not be used inflexibly by courts to determine whether reasonable suspicion exists to detain an individual. *Hanson*, 801 F.2d at 762; *Berry*, 670 F.2d at 600. However, "the fact that a characteristic of a defendant also happens to appear on the profile does not preclude its

use as a justification providing reasonable suspicion for a stop." Moreover, a court should not downgrade the significance of a particular factor merely because it appears on the profile. *Berry*, 670 F.2d at 601. In short, drug courier profile characteristics are often useful in focusing the attention of a law enforcement official on a particular individual and may be relied upon, in conjunction with other individualized factors, to support a finding of reasonable suspicion.

(1st Cir.1982). *See also United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984). In this vein, the district court specifically noted that Officer Glenn had been working narcotics and controlled substances for approximately sixteen to seventeen years, spending the majority of his time in the Dallas/Ft. Worth area.

Thus, in view of Gonzales' suspicious appearance and behavior in the airport terminal and during her communication with Glenn, in conjunction with Gonzales' deliberate attempt to mislead the officers as to her time of departure, we believe that sufficient reasonable suspicion existed to warrant the brief detention of Gonzales by the DEA officers. Accordingly, we affirm the district court's conclusion that the fourth amendment was not violated.

### B. *Voluntariness of Confession*

Gonzales further contends that the evidence seized from her during the investigatory stop at the airport should be excluded because her consent to the search of her gym bag was not voluntary, but instead was the product of subtle police coercion. Since the government does not contend that it possessed probable cause to search Gonzales' bag, but instead relies on Gonzales' consent to justify the search, the government has the burden of proving with "clear and convincing evidence that consent was freely and voluntarily given." *United States v. Parker*, 722 F.2d 179, 182 (5th Cir.1983). *See also Bumper v. North Carolina*, 391 U.S. 543, 548–49, 88 S.Ct. 1788, 1792, 20 L.Ed.2d 797 (1968). Voluntariness is "determined by the totality of all the circumstances." *United States v. Cherry*, 794 F.2d 201, 205 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 932, 93 L.Ed. 2d 983 (1987) (quoting *Mendenhall*, 446 U.S. at 557, 100 S.Ct. at 1879). *See also Schneckloth v. Bustamonte*, 412 U.S. 218, 226, 93 S.Ct. 2041, 2047, 36 L.Ed.2d 854 (1973). As the district court's resolution of the voluntariness issue is a finding of fact, we will not overturn that finding unless clearly erroneous. *United States v. Davis*, 749 F.2d 292, 294 (5th Cir.1985), *cert. de-*

*nied*, —— U.S. ——, 107 S.Ct. 464, 93 L.Ed. 2d 409 (1986).

Cognizant at all times of the fact that acquiescence cannot substitute for free consent, this Court has outlined six primary factors for consideration in determining whether consent to a search is knowing and voluntary. Specifically, those factors are (1) the voluntariness of the defendant's custodial status, (2) the presence of coercive police procedure, (3) the extent and level of the defendant's cooperation with the police, (4) the defendant's awareness of his right to refuse consent, (5) the defendant's education and intelligence, and (6) the defendant's belief that no incriminating evidence will be found. *United States v. Ruigomez*, 702 F.2d 61, 65 (5th Cir.1983). *See also United States v. Phillips*, 664 F.2d 971, 1023–24 (5th Cir.1981). While noting that all of the above factors are highly relevant, this Court has concluded that no one of the six factors is dispositive or controlling of the voluntariness issue. *Ruigomez*, 702 F.2d at 65.

On the facts of the instant case, we cannot say that the district court's finding that Gonzales voluntarily consented to the search of her bag is clearly erroneous. In this respect, the district court specifically found the following:

> Glenn, a Drug Enforcement Agent, approached Gonzales, and in a normal voice, asked if he could speak with her. Gonzales admitted that Glenn did not threaten her. Glenn did not require Gonzales to remain and answer questions. Glenn did not confine Gonzales in a small area. Glenn asked Gonzales a few questions before asking Gonzales if he could look into the carry-on bag. Gonzales was very cooperative and answered all of Glenn's questions. Gonzales had no problem communicating with Glenn even though she is of Mexican descent.

> Based upon these facts, the Court finds that Gonzales' consent to inspect the carry-on luggage was voluntary even though Glenn did not explicitly tell Gonzales that she had a right to refuse to consent to the search.

It is important that Gonzales was not in official custody when she allowed Glenn to look in her bag, although she was "seized" for fourth amendment purposes. Additionally, there is no evidence that the DEA officers coerced, threatened, or tricked Gonzales in any manner to obtain her consent; in fact, Gonzales was freely cooperating with the officers. While Gonzales was not informed of her right to refuse to consent to the search of her bag and certainly this is a critical factor in any voluntariness analysis, apprising a suspect of the right to refuse consent is not required to render the consent voluntary. *Berry*, 670 F.2d at 598 n. 14. Further, despite Gonzales' sixth grade education and Hispanic descent, the district court specifically found that Gonzales had no problem communicating with Glenn and answering all of his questions. Finally, while Gonzales was certainly aware that incriminating evidence would be disclosed by a search of her bag, we do not believe this factor sufficient to warrant a contrary finding from that of the district court on the issue of consent.[3]

In short, whether Gonzales' consent to the search of her bag was voluntary is a factually close determination; however, our standard of review is not de novo. While a de novo review might support a different result, applying the deferential "clearly erroneous" standard, the scales tip in the balance of a conclusion by this Court affirming the district court's order finding Gonzales' consent voluntary.

### III. *Conclusion*

In sum, prior to the time Officer Glenn informed Gonzales he was "working narcotics" and requested to look in her bag, Glenn and Gonzales were engaged in "mere communication" outside the compass of the fourth amendment. Thereafter, when Gonzales was seized for purposes of the fourth amendment, the DEA officers possessed the requisite reasonable suspicion to detain Gonzales. Subsequently, as found by the district court, Gonzales freely and voluntarily consented to the search of her gym bag, rendering the contents of that search admissible. We cannot say that the district court's finding in this regard was clearly erroneous. Accordingly, we affirm the district court's order denying Gonzales' motion to suppress.

AFFIRMED.

---

**3.** The key question regarding the validity of consent is not "whether [the suspect] acted in her ultimate self-interest, [by consenting to the search] but whether she acted voluntarily." *Berry*, 670 F.2d at 598 n. 16 (quoting *Mendenhall*, 446 U.S. at 559, 100 S.Ct. at 1879–80). In the purest sense, consent by suspects with knowledge that incriminating evidence will be discovered during a search would never be truly voluntary if self-interest were the primary focus of the voluntariness inquiry.