**Emma Jane HOWARD, Plaintiff,**

v.

**David VANDIVER, Defendant.**

**Civ. A. No. EC 88–339–D–D.**

United States District Court,
N.D. Mississippi, E.D.

Feb. 8, 1990.

Jim Waide, Tupelo, Miss., for plaintiff.

Leslie Ridlehoover, Jackson, Miss., for defendant.

## MEMORANDUM OPINION

DAVIDSON, District Judge.

On May 25, 1988, Officer David Vandiver of the Alcohol Beverage Control Division of the Mississippi State Tax Commission stopped and searched a car owned and operated by the plaintiff, Emma Jane Howard, in Monroe County, Mississippi. Monroe County remains "dry" while the counties surrounding it have voted "wet."[1] The defendant stopped Ms. Howard to conduct a search of her car for illegal liquor. The plaintiff, who was then running for the position of Alderman of her ward in Aberdeen, was upset by the search, and filed the instant action claiming damages for the alleged violation of her fourth amendment rights, and for emotional distress and injury to her reputation. The plaintiff also claims that the stop and search violated the fourteenth amendment's equal protection clause, as "similar arbitrary searches are not done against white citizens." The defendant has filed a motion for summary judgment on the matter of the stop and search.[2]

## I.

### "THUNDER ROAD"

The plaintiff is a black woman who, at the time of the incident, was 24 years old. She was then a candidate for Alderman.[3] Emma owns her own business, a small store in a poor section of Aberdeen. The store building and the land upon which it sits are leased by the plaintiff; they are owned by Mr. C.R. Suggs, whose own place of business is located next door. The two stores are not in direct competition with one another, as Mr. Suggs' primary source of income is from the liquor he sells. "C.R." is a 63–year old white male, and is further the most notorious bootlegger in this area where prohibition never died.

1. With the sole exception of Itawamba County. The law is such that possession or sale of alcoholic beverages with an alcohol content of 4 percent or higher is illegal. "Light" wine is legally available, as is the ubiquitous "three-two" beer which can be found in every supermarket and corner store. It has been alleged elsewhere that, until recently, liquor was openly available by the drink at the Aberdeen Country Club. *See Suggs v. Vandiver,* No. EC 88–219 (N.D.Miss. Aug. 8, 1989) (Order granting summary judgment) (Appeal filed 5th Cir., Aug. 16, 1989).

2. The motion makes no separate mention of the stop, but as several of defendant's arguments are applicable to the stop as well as to the search of the vehicle, the court will reach that matter. The defendant has made no mention of the plaintiff's claim for unequal application of the law based on race; the court will not address that claim on the instant motion.

3. The election has been held since the filing of this action; the plaintiff was unsuccessful.

The defendant tendered C.R.'s deposition, taken on February 9, 1989 in another case[4], from which the following excerpts are gleaned:

Q: What is your current occupation?

A: Bootlegger.

Q: Do you mind if I use that term?

A: No, I don't mind.

Q: What is you primary source of income?

A: Bootlegging.

. . . . .

Q: How long have you been employed as a bootlegger?

A: I've been there since '52.

. . . . .

Q: You said you've been in the business of selling liquor since 1952?

A: At that address, yeah. [At his current address of 1302 Hahn Street, Aberdeen.]

Q: Okay.

A: I started several years before then.

Q: How old are you?

A: 62.

Q: How old were you when you started bootlegging?

A: Probably 16.

. . . . .

Q: Do you have liquor in your store everyday? . . .

A: Most every day; in fact, that's my primary business.

The plaintiff has been closely associated with "C.R." for many years. That gentleman is the father of plaintiff's 13–year old daughter; C.R. pays child support to the plaintiff. In addition to their familial and legitimate business entanglements, Emma for many years helped C.R. in the shadier of his business endeavors.

Emma has been arrested several times for alcoholic beverage violations in Monroe County, arising out of her part in C.R.'s bootlegging business. Some of these arrests have led to convictions. Emma's arrests were either for personal possession of alcohol or for her work as a sales clerk in C.R.'s store. The plaintiff was last arrested on December 20, 1984, was found guilty in her absence of possession of alcoholic beverages, a misdemeanor, and was fined $500.00 plus costs. The last firm date that the defendant knew of on which Emma had been involved in C.R.'s bootlegging operations was August 29, 1985. On that date, an "undercover informant" allegedly purchased a bottle of Old Charter from Emma at C.R.'s place. The ABC agents raided the store and confiscated a plentiful supply of various brands and kinds of liquor. No charges were filed against Emma. Emma's last known involvement in bootlegging was thus almost three years before the defendant stopped her to search for contraband.[5] The defendant also testified that the plaintiff had been seen in C.R.'s company since that time, specifically at court during several of C.R.'s regular court appearances, and that she had posted bail for him a few times. It should be noted that Emma had never, to the defendant's knowledge, gone by herself to purchase liquor, but rather had been seen on a few occasions with C.R. when he went to restock his shelves. It should further be noted that the plaintiff was never known to purchase the alcohol on her own.

One other incident is thus of particular note: *on one occasion prior to August 1985,*[6] the defendant and other ABC agents

---

4. *Suggs v. Vandiver, supra* at n. 1. Citation is to the deposition of C.R. Suggs, at pages 1–8. It should be noted that this deposition was taken after the stop and search of the plaintiff's car, and was thus not considered by the defendant in reaching his conclusion that probable cause existed.

5. The defendant testified at his deposition that he had seen the plaintiff at some time after August 1985, in C.R.'s store "while bootlegging was going on." He did not implicate her as an active participant. Indeed, it is not even clear

from the testimony whether she was merely present in the store where liquor was known to be kept or was somehow engaged in a more suspicious manner. *Compare Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969).

6. The defendant did not give a date for this occurrence, but as he could recall no instance of criminal activity after August of 1985, the alleged switch of cars must have occurred at some time prior to that date.

had seen Emma and C.R. buying C.R.'s stock in trade at a package store in Nettleton, Mississippi, a town in the "wet" county of Lee, approximately 15–20 miles north of Aberdeen. At that time they were driving a Chevrolet Nova. The agents lost track of them on the roads of Lee County. About half-an-hour later, the ABC agents stopped C.R. driving a Ford Pinto; he was alone.[7] The defendant claims that he concluded that the plaintiff must have helped C.R. switch cars to evade detection and must have driven the Nova, still loaded with the liquor, back to Aberdeen. This is the sole alleged instance of prior criminal activity known to the defendant which allegedly involved the plaintiff driving a car in which liquor was being illegally transported when she was not in the company of C.R.

The defendant has testified in his deposition that he saw the plaintiff[8] driving north from Aberdeen toward the community of Wren.[9] The car plaintiff was driving was owned by the plaintiff, but was one which C.R. was known to use from time to time.[10] Officer Vandiver stated that at the time of the stop and search he was aware of the plaintiff's past arrests and convictions, and her other continued associations with C.R. He knew that at the time of day he saw her leaving Aberdeen, Emma was normally to be found at her store, or at least on her way there. The defendant drove to plaintiff's store and found it closed. He also found Mr. Suggs' store closed and that the van which C.R. had been using lately was gone.[11] From these facts, the defendant concluded that the plaintiff was "probably" going to meet C.R. in Nettleton to get liquor, and that she and he would again switch cars to avoid scrutiny, bringing the liquor back in her car.

Plaintiff had, instead, driven with her aunt and a small child to an electronics repair shop in Wren to take two stereos for repair.[12] The defendant stopped plaintiff's car on her way back into Aberdeen, approximately half-an-hour after he had originally seen her. He felt that the intervening time was consistent with the trip to Nettleton and the subterfuge he envisioned. He stopped the car for the sole purpose of conducting the search for illegal liquor.

The parties tell varying stories of the officer's conduct of the stop and search. The defendant claims that he stopped plaintiff's car, asked her for the keys to the trunk, and that she thereupon voluntarily opened the car's trunk using a lever in the passenger compartment. The plaintiff claims that defendant came up to the car, and said that he just wanted to chat. He asked her for the keys to the trunk, and she refused. She asked if he had a warrant, and he said "no" but that he wanted

7. Apparently, the searchers came up with nothing, though this is not made entirely clear. The defendant also fails to state where C.R. was stopped, but it appears to the court on the facts presented that the time elapsed was sufficient for him to have returned to his store in Aberdeen and traded one car for the other. The court notes that several facts do not fit with the defendant's conclusion that Emma must have swapped cars with C.R.; particularly inconsistent is the fact that, under their version of the event, the liquor was driven back to Aberdeen in the same car in which they were seen when they purchased the liquor. Such a scheme would be practically useless in evading scrutiny, as the police would be searching for the contraband as much or more by the car as by the driver.

8. He testified that he did not see the plaintiff's aunt, Massie Haynes, in the car, nor the small child who was with Ms. Haynes, until he stopped the car on plaintiff's return to Aberdeen.

9. Wren is about 12–15 miles north of Aberdeen, and is also in Monroe County, and so is also "dry". The defendant testified that he thought that plaintiff was on her way to Nettleton, which lies beyond Wren on Highway 45. This is of little moment as all of the four main roads from Aberdeen lead to towns in the neighboring "wet" counties.

10. The defendant testified erroneously that the car was owned by Suggs; C.R., however, later testified in his deposition that all the cars he bought were in plaintiff's name.

11. Defendant testified that the bootlegger's business was also usually open at that time of the morning.

12. The stereos had to have their cartridges replaced. Plaintiff claims that the stereos were in the back seat when she was stopped; Officer Vandiver does not recall seeing them.

the keys anyway. She states that she thought that he was about to reach in to get the keys,[13] and so she pulled the lever to the trunk. Both agree that she then got out and went with Officer Vandiver to the rear of the car. No contraband was found.

## II.

### "THE DEVIL'S BREW" AND THE "REVENOOERS"

Officer Vandiver argues that as a matter of law the stop and search were legal on several grounds—the plaintiff's purported consent to the search,[14] the asserted presence of probable cause, and the supposed constitutionality of the stop and search despite the possible failure of probable cause—and he also raises qualified immunity. The court holds that probable cause was required under the facts of the instant case, that the officer lacked probable cause, and that there exists a genuine issue of material fact regarding plaintiff's consent to the search. The difficult question to be answered is that of qualified immunity as to the existence of probable cause.

■ To stop a car in order to conduct a search, the fourth amendment does not require a warrant, but does require that the officer have probable cause to believe that the car contains contraband.[15] *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *United States v. Prati*, 861 F.2d 82 (5th Cir.1988). The defendant argues for a change in this general rule based on a theory similar to that of *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The defendant claims that, as the stop and search were minimally intrusive, the requirement of probable cause may be satisfied by the existence of a reasonable suspicion. The court notes a factual distinction from the typical *Terry*-stop situation; the defendant admittedly stopped the vehicle for the sole purpose of conducting a search for contraband. He did not so much as ask the plaintiff to explain her mid-morning trip. It is clear that the stop was not performed to investigate suspicious activity nor was the search conducted incident to that stop for the officer's protection.

■ Similarly, the defendant claims that the balancing of the search's intrusiveness against the governmental interest, *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983), supports a holding that something less than probable cause was required. The court finds this contention to be without merit.[16] The court is further of the opinion that no reasonable officer could have based his determination that the stop and search he was

**13.** The plaintiff does not assert that he actually attempted to reach into the car. "Q: What occurred to make you believe that he was about to happen? A: Well, the attitude he had, the way he was talking, he was just going to reach over, you know." Deposition of Emma Howard, page 15, line 13–16.

**14.** This issue would not affect plaintiff's fourth amendment claim arising from the stop. *See Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949).

**15.** "The word 'automobile' is not a talisman in whose presence the fourth amendment fades away and disappears." *Coolidge v. New Hampshire*, 403 U.S. 443, 461–62, 91 S.Ct. 2022, 2035, 29 L.Ed.2d 564 (1971).

**16.** The court is inclined to question the strength of the governmental interest in conducting the search of plaintiff's car. First, the officer based his conclusion that there existed probable cause for the search on the assumption that he knew where plaintiff was going with the liquor and what she and C.R. intended to do with it there. The officer did not attempt to follow the plaintiff to the store, nor did he attempt to stop her at the county line to be certain that the alcohol didn't get into the county and go somewhere else. C.R. made no secret of his bootlegging activities at his Aberdeen store. His premises were raided regularly, but not so often as to stop the flow of distilled spirits into this pure and untainted county's residents.

Further, given the attitude of the surrounding wet counties, one might question the sincerity of the defendant's assertion that this represented a matter of grave governmental interest. *See* note 1, *supra*. The court is cognizant of the distinction, long recognized at common law, between matters which are illegal because they are *malum in se* and those which are merely *malum prohibitum*, that is, matters which are wrong in and of themselves and those which are wrong merely because they have been proscribed.

about to conduct would have been constitutionally valid in the absence of probable cause solely on the strength of the governmental interest weighed against the intrusiveness of the search, especially in light of the clear precedent calling for probable cause for such a stop; thus qualified immunity is not applicable on this theory to protect the defendant from liability.

■■■■ The defendant also argues that the search was valid because the plaintiff consented thereto. It should first be noted that consent to the search, if established, would in no way affect the validity of the stop itself. *See Brinegar v. United States,* 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949). That even a brief stop is a seizure is well-established. *See e.g. Terry v. Ohio, supra.* There exists a factual issue as to the circumstances of plaintiff's consent and whether that consent was voluntary. Relevant factors in the analysis of a confession for voluntariness include: the voluntariness of plaintiff's custodial status; the presence of coercive procedures; the extent and level of plaintiff's cooperation with the police; plaintiff's awareness of her right to refuse to consent; and the plaintiff's belief that no incriminating evidence will be found. *United States v. Gonzales,* 842 F.2d 748 (5th Cir.1988). This factual issue not only precludes entry of summary judgment on the merits, but also precludes a determination of the objective legal reasonableness of the officer's purported belief in the voluntariness of the consent. Thus the court denies summary judgment on the theory of plaintiff's consent to the search and on the basis of qualified immunity arising out of that theory.

■■■■ Finally, the court is firmly convinced that probable cause was lacking for the stop and search of the plaintiff's car, at least in the current state of the record. The court will discuss the intertwined issues of probable cause and qualified immunity based on that theory together. The court finds itself faced with the difficult task of combining the probable cause analysis with the qualified immunity analysis; these two issues have separately

caused excessive confusion and have spawned voluminous precedent. The task is made somewhat easier by the Supreme Court's decision in *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523, 531 (1987). The addition of the standard for summary judgment to this already troublesome mix, however, would be enough to undermine the determination of a teetotaler, even here in Monroe County.

The summary judgment standard is well known. The basic formulation can be distilled as follows: the court must find that there are no genuine issues of material fact, and that the movant should prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202, 213 (1986). The court must examine each issue in the light most favorable to the non-movant. *Id.* at 249, 106 S.Ct. at 2510, 91 L.Ed.2d at 212.

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact", since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265, 273 (1986). In the qualified immunity context, the Supreme Court contemplated that the same standards for summary judgment apply as in other cases. *Harlow v. Fitzgerald,* 457 U.S. 800, 816 n. 26, 102 S.Ct. 2727, 2737 n. 26, 73 L.Ed.2d 396, 409 n. 26 (1982); *see also Stevens v. Corbell,* 832 F.2d 884 (5th Cir.1987), *reh'g denied,* 838 F.2d 1214, *cert. denied,* 486 U.S. 1033, 108 S.Ct. 2018, 100 L.Ed.2d 604 (1988).

■■■■ The defendant has pled the existence of qualified immunity.[17]

---

**17.** Qualified immunity is an affirmative defense,    and as such, it must be pled by the defendant

[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such cases those officials—like other officials who act in ways they reasonably believe to be lawful—should not be held personally liable.

*Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3039, 97 L.Ed.2d at 531, *citing Malley v. Briggs,* 475 U.S. 335, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). The question presented is whether the stop and search were objectively legally reasonable when assessed in the light of the legal rules which were clearly established at the time of the stop and search and of which a reasonable officer would have been aware. *Anderson v. Creighton,* 483 U.S. at 639, 107 S.Ct. at 3038, 97 L.Ed.2d at 530. "The relevant question in this case ... is the objective ... question whether a reasonable officer could have believed [the defendant's] warrantless search to be lawful in light of clearly established law and the information the searching officer[ ] possessed." *Id.* at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 532.

It follows from what we have said that the determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause of exigent circumstances will often require examination of the information possessed by the searching officials.... [T]his does not reintroduce into qualified immunity analysis the inquiry into officials' subjective intent that *Harlow* sought to minimize.

*Anderson v. Creighton,* 483 U.S. at 641, 107 S.Ct. at 3040, 97 L.Ed.2d at 531–32. It appears to this court that to avoid the same sort of subjective inquiry that *Harlow* dealt with, the court must accept as true the claims of the defendant with respect to the facts assertedly relied on by the defendant in determining that he had probable cause to conduct the search, in the absence of evidence to the contrary.

Defendant Vandiver claims that, in addition to the plaintiff's prior criminal activities, the last of which occurred almost three years before the date of the stop, he relied on the following facts in determining that there was probable cause for a search of the plaintiff's vehicle:

asserting it. *See Harlow, supra,* 457 U.S. at 815, 102 S.Ct. at 2736, 73 L.Ed.2d at 408; *Gomez v. Toledo,* 446 U.S. 635, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980); *Creamer v. Porter,* 754 F.2d 1311, 1317 (5th Cir.1985); *Saldana v. Garza,* 684 F.2d 1159, 1163 and note 13 (5th Cir.1982); *Barker v. Norman,* 651 F.2d 1107, 1120 (5th Cir.1981); *Barrett v. Thomas,* 649 F.2d 1193, 1201 (5th Cir.1981); *Jackson v. Mississippi,* 644 F.2d 1142, 1145 (5th Cir.1981); *but see Elliott v. Perez,* 751 F.2d 1472, 1478 (5th Cir.1985). Indeed, the Fifth Circuit has "repeatedly stated that a district court should not dismiss a Section 1983 damage claim on grounds of qualified immunity unless that affirmative defense has been asserted by the defendant." *Saldana v. Garza,* at 1163. The defendant officer has the burden of proving "that he was acting within the scope of his discretionary authority when the allegedly wrongful act occurred." *Id.* at 1164 n. 17, quoting *Barker v. Norman,* 651 F.2d at 1121 and note 18. There is no assertion in the instant case that the defendant was not acting in the scope of his discretionary authority.

The rule in this circuit is that, once the defendant has properly pled the affirmative defense of qualified immunity, "the burden shifts to the plaintiff to breach the official's immunity by

showing that the official lacked [objective] good faith." *Saldana v. Garza* at 1163 n. 14, quoting *Garris v. Rowland,* 678 F.2d 1264, 1271 (5th Cir.1982); *Rheaume v. Texas Department of Public Safety,* 666 F.2d 925, 930 (5th Cir.1982); *United Carolina Bank v. Board of Regents,* 665 F.2d 553, 562 (5th Cir.1982); *Barker v. Norman,* 651 F.2d at 1121.

The analysis does not, in this court's opinion, end there. The plaintiff has asserted, and the defendant has admitted, that the search was carried out without a warrant. The fourth amendment requires a warrant in order for a constitutionally permissible search to be carried out, except in certain clearly defined circumstances. It appears to the court that, under the Fifth Circuit rule, the burden of production, at least, must logically shift to the defendant at this point in the analysis. The plaintiff cannot be held to the necessity of producing evidence that the officer did not know certain facts at the time of the search, where the officer is under no compulsion to state what factors he purportedly relied on. Under the general rule of *Harlow, supra,* the burden would remain on the defendant and this question would not arise. Fortunately, as the plaintiff does not dispute the *facts* relied upon by the officer, this court need not here decide this question.

(1) that the plaintiff was away from her store at the start of her normal business hours;

(2) that she was traveling out of Aberdeen in a direction which could lead to a locality where it was legal to buy liquor;[18]

(3) that she was a long-time intimate associate of C.R. Suggs, a known bootlegger, and had been known to help him in minor ways in pursuing his chosen profession;

(4) that she was driving a car, title to which was in her name, but which C.R. was known to use on occasion;

(5) that C.R. was likewise away from his business, and that the van he had been using was not at his store;

(6) that at some time at least three years before the stop, he had seen the plaintiff with C.R. at a liquor store in Nettleton purchasing liquor. At that time they were driving a Chevy Nova. C.R. was stopped half-an-hour later driving another car, but no contraband was discovered.

There has been no contention by the plaintiff that the defendant was not aware of the facts as stated at the time of the stop.

The defendant drew two conclusions from this information. First, he concluded that the facts recited under number (6) meant that the plaintiff had played an active role on one prior occasion in helping C.R. to evade the scrutiny of law enforcement officers by switching cars with C.R., and that she had transported the liquor on that occasion. Second, he concluded that Emma was going to meet C.R. in Nettleton to switch cars with him again, and that she would be driving the car which held the liquor.[19] As noted above, *see* note 7, the court questions the reasonableness of the officer's underlying first assumption. It is logically possible for the defendant's ulti-mate conclusion to stand without this first conclusion, so the court does not give the matter an all-or-nothing probable cause analysis.[20] The matter will be given due weight in light of its reasonableness in the totality of the circumstances. *See Spinelli v. United States*, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637, 643 (1969).

A person's prior convictions for similar criminal acts may be considered for purposes of establishing probable cause, despite the fact that such evidence might not be admissible at a criminal trial arising out of evidence found in the resulting search. *See Draper v. United States*, 358 U.S. 307, 311–12, 79 S.Ct. 329, 331–32, 3 L.Ed.2d 327 (1959); *United States v. Melvin*, 419 F.2d 136 (4th Cir.1969). That fact alone is generally not sufficient to establish probable cause. *Melvin, supra.* This court finds three-year old misdemeanor convictions to be of very limited weight in support of a finding of probable cause. The same holds true for prior criminal acts known to the officer which are of similar age and severity, but which were never the subject of criminal charges, trial or conviction. Prior to the last known instance of plaintiff's complicity in Mr. Suggs' bootlegging operations, the plaintiff was arrested or at least seen to commit alcoholic beverage violations with some regularity; given that, the intervening three-year period without any further known active participation in C.R.'s profession severely weakens the probative value of plaintiffs long-past acts.

Defendant cites the case of *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1924) in support of his contentions that he had probable cause for the stop and search, or alternatively that he is protected by qualified immunity for his objectively reasonable belief that probable cause existed. The *Carroll* case arose

---

**18.** On that route, she would first pass through another community in the same dry county.

**19.** The essence of defendant's claim that he could search the car in the absence of a warrant was that he purportedly had probable cause to believe that the car contained contraband. The second of these conclusions is the basis of offi-cer Vandiver's claim to qualified immunity; the first conclusion supports the second.

**20.** If the first conclusion were a necessary predicate for the ultimate conclusion of probable cause, the court would consider whether, as to each such step, the conclusion rested upon probable cause.

out of the bootlegging operations of the prohibition era, beside which C.R.'s efforts pale.[21] The Supreme Court found that probable cause existed for the stop and search of Carroll's car on suspicion of carrying alcohol. The facts which support the finding of probable cause are similar to those of the instant case.

■ The court's own research has discovered the later case of *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1948), which *is substantially similar to Carroll, and is closer to the instant case than is Carroll.*[22] The case arose out of importation of liquor from Missouri, where alcohol could be legally purchased, to Oklahoma, which was "dry". The Court in *Brinegar* described the factual situations of the two cases as follows:

In each case the search was of an automobile moving on a public highway and was made without a warrant by federal officers charged with enforcing federal statutes outlawing the transportation of intoxicating liquors (except under conditions not complied with). In each instance the officers were patrolling the highway in the discharge of their duty.

And in each before stopping the car or starting to pursue it they recognized both the driver and the car, from *recent* personal contact and observation, as having been *lately* engaged in illicit liquor dealings.

*Brinegar*, at 165–66, 69 S.Ct. at 1306, 93 L.Ed. at 1885 (emphasis added).

In *Carroll* the suspects had offered to sell large quantities of illegal liquor to the undercover officers on September 29 and 30; the officers saw the same men in the same car driving from their home town to Detroit on October 6, but were unable to follow them more than halfway to Detroit. Two months later, on December 15, the same officers saw the same men in the same car on the same road coming from the direction of Detroit. They stopped the suspects, and discovered a large quantity of scotch and gin behind the upholstering of the seats. The time from first incident to search was under three months.

In *Brinegar*, the officer saw the suspect driving west into Oklahoma from the direction of Joplin, Missouri. The officer had arrested Brinegar five months earlier for

---

**21.** C.R. tries as hard as those original American bootleggers, but through no fault of his own the challenge is simply not as great. Now every citizen of sufficient age can be his own bootlegger with a short trip out of county. *Such is the price we have to pay for progress.*

**22.** This raises an ambiguity in the application of the objective standard for qualified immunity; the defendant officer did not raise *Brinegar*, and thus presumably did not know of its holding prior to the stop and search of Emma's car. The objective test, however, relies on the law that was "clearly established" in such a way as to impact the determinative processes of the hypothetical reasonable officer. The court assumes that a reasonable officer in the Alcoholic Beverage Control Division, whose sole enforcement duties revolve around the confiscation of contraband liquor, would at least be familiar with the *Brinegar* decision as well as the *Carroll* decision and other decisions on searches and seizures by the United States Supreme Court. This officer apparently was not.

It is clear that the court must consider *Brinegar* on the issue of the existence of probable cause, because the defendant cannot be held liable for conducting a constitutional search. It is not clear that the defendant should, by virtue of the objective reasonableness standard, be pre-

sumed to have knowledge of decisions from which he might have extrapolated, but did not, to support his determination that the action complained of was constitutional. It is the opinion of this court that the presumption implicit in the objective reasonableness standard is rebuttable; the purposes behind *Harlow* would be as well served by a rebuttable presumption of knowledge of such similar decisions, as by an irrebuttable presumption. A complementary rule already exists where the similar decisions are arguably contrary to the defendant's position. *See Harlow v. Fitzgerald*, 457 U.S. 800, 819, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396, 411 (1982). (Officer has burden of proving that there were "extraordinary circumstances" which kept the officer from knowing of clearly established right.) The presumption would have to be a heavy one, so as to avoid issues of fact in every case; here, the court is presented with what amounts to an admission of ignorance. As the *Brinegar* case is so similar to the *Carroll* case, however, the court is of the opinion that this distinction will make little difference in practical outcome; and as the court finds it less confusing to continue to discuss the existence of probable cause and the derivative qualified immunity theory together, the court will continue as though it presumed the defendant's knowledge of the *Brinegar* decision.

illegally transporting liquor; had seen him loading liquor into a car or truck in Joplin at least twice in the preceding six months, and knew him to have a reputation for hauling liquor. The officer recognized both the suspect and his car, which appeared to be heavily loaded.

The primary distinction between the present case and the cases of *Brinegar* and *Carroll* is obvious; in the instant case, the last known instance of criminal activity by the plaintiff was almost three years before the search. Further, the plaintiff's last known criminal activity was of a different character than that in *Carroll* and *Brinegar*. It does not lead to the conclusion that plaintiff was herself likely to transport illegal liquor in her car. The defendant only alleges one instance in which—it was his somewhat unreasonable conclusion—the plaintiff drove a car full of alcohol. The court discounts the weight of this conclusion, as noted above, and again notes that it is unclear from the record before the court on the instant motion for summary judgment when this incident took place.

Also, in the instant case, the route chosen from Aberdeen was no more suspect than any other route from town. In *Carroll* the route taken by the suspect's car was the main road between his hometown and Detroit, a primary source of alcohol. In *Brinegar*, the route was between the suspect's hometown and the nearest source of alcohol across the state border. In both these older cases, the route taken allowed for a conclusion that the suspect was coming from the nearest or largest—in other words, the most likely—source of illegal alcohol. As Monroe County is practically surrounded by "wet" counties, each road out of town is equally "suspicious" and thus equally innocent.[23]

The court is thus convinced that Officer Vandiver did not have probable cause for the search he undertook of plaintiff's car. Any other holding by this court would allow Alcohol Beverage Control agents or the police to stop the plaintiff at any time she was seen on the roads of Monroe County, merely by virtue of her long-dead criminal past and her continued association with the father of her child.

The mythical "reasonable officer" who relied on *Brinegar* or *Carroll* would, of necessity, have known the factual situations upon which they rested—without that knowledge the case would be useless to the officer in determining the existence of probable cause on the facts before him. The reasonable officer would thus have recognized the distinctions between those cases and this, at least as to the primary factors considered by the Supreme Court in upholding the decisions of those other officers that probable cause existed. The reasonable officer, on the facts presented for summary judgment, would have recognized that the plaintiff's prior convictions and arrests were stale, that there was no solid evidence of her ever transporting alcohol for C.R.'s store, and that the route taken was not itself suspicious. The reasonable officer would have realized that there was sufficient time, especially in light of Federal Rule of Criminal Procedure 41(c)(2)[24], to apply for a warrant. In short, the reasonable officer would have realized that the stop and search were unconstitutional in view of the facts as presented on consideration of this motion. This court is therefore of the opinion that summary judgment is improper at this time.

An order in conformity herewith shall issue.

---

**23.** The court takes notice as well of the fact that Nettleton is not necessarily the largest nor the nearest source of alcohol to Aberdeen.

**24.** Rule 41(c)(2), enacted in 1977, provides for the issuance of a warrant by telephone.